FILED

Apr 05 2019, 9:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| Leanna Weissmann | Andrew S. Williams |
| Lawrenceburg, Indiana | Hunt Suedhoff Kalamaros, LLP |
| | Fort Wayne, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| James R. Stroud, Heartland Homestead, LLC, and Heartland Land Trust, | April 5, 2019 |
| *Appellants-Defendants,* | Court of Appeals Case No. 18A-CC-1722 |
| v. | Appeal from the Dearborn Superior Court |
| Thomas J. Stone, | The Honorable James D. Humphrey, Special Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 15D02-1602-CC-53 |

**Robb, Judge.**

## Case Summary and Issues

[1] James Ryan Stroud, Heartland Homestead LLC, and the Heartland Land Trust (collectively "Stroud," where appropriate) appeal the trial court's judgment in favor of Thomas Stone granting him principal and interest due on a promissory note and further awarding him $25,000 in earnest money due as a result of a failed contract to purchase land. Stroud raises three issues for our review, of which we find the following dispositive: 1) whether Stone's action on the promissory note was barred by the statute of limitations; and 2) whether judgment was entered against the proper parties on the claim for earnest money. Concluding the claim on the promissory note was time-barred and that accordingly, the judgment must be amended to reflect the proper party owing the earnest money, we reverse in part and remand.

## Facts and Procedural History

[2] On April 29, 2003, Stone executed a deed to Heartland Homestead LLC conveying a twenty-two acre mobile home park and a non-contiguous twenty acres of unimproved agricultural farmland in Dearborn County, Indiana. At that time, Stroud and Steven Verkley were 50/50 partners in Heartland Homestead LLC. A portion of the purchase price was financed by Fifth Third Bank which took a first mortgage on the property. Stone received cash at closing and a Promissory Note for $100,000, signed by Stroud and Verkley in their individual capacities and as members of Heartland Homestead LLC. The

Promissory Note was secured by an Open-End Mortgage, Assignment of Leases and Rents and Security Agreement and Stone was a junior lienholder.

[3]     The Promissory Note required installment payments of $833.33 per month beginning June 1, 2003 until the amount was paid in full. The maturity date was July 1, 2013. The terms of the Promissory Note provided that, upon default and thirty days after written notice from Stone, "the entire principal balance and all accrued interest shall at once become due and payable without additional notice or demand at the option of [Stone]." Exhibit Volume I at 34. Stone received payments on the Promissory Note through May 2008 totaling $50,000. After that, he did not receive any more payments.

[4]     The mobile home park was less profitable than anticipated and Heartland Homestead LLC became unable to pay the Fifth Third mortgage. On October 31, 2008, Fifth Third Bank filed for foreclosure.[1] With the property due to be sold at a foreclosure sale, Stroud hatched a plan. Stroud first approached Stone and asked if he would be willing to buy the entire project, but Stone declined. Stroud then arranged for a trust he would set up to buy the property from Fifth

---

[1] At least in part due to these difficulties, Verkley no longer wished to be a member of Heartland Homestead LLC. In 2006, Stroud and Verkley transferred their entire interests in Heartland Homestead LLC to Christopher Grigsby, and Grigsby relieved Verkley of his obligation to Fifth Third. Stroud remained obligated on the Fifth Third mortgage and both Stroud and Verkley remained obligated on the Stone promissory note. Stroud continued to manage the mobile home property. Just prior to the 2009 deal, Grigsby transferred the entire interest back to Stroud so Heartland Homestead LLC could sell the property to the Heartland Land Trust.

Third for $250,000 and obtained financing from another bank.[2] Despite turning down the opportunity to buy back the entire property, Stone testified he and Stroud made the following agreement with respect to the farmland:

> "Look," I said, "Here's – you've paid me $50,000 on that note." And I said, "Why don't I just give you back that $50,000, even though you want to give the land for what you're trying to do." And [Stroud] was thrilled. . . . He said, "That'll be great. I can put that down on my $550,000 purchase." . . . And I said, "Put it together." . . . It seemed pretty straightforward. I would release my – release the mortgage and provide a check for $50,000 in exchange for free and clear title to the 20 acres. It was as simple as that.

Transcript, Volume 1 at 35. Stroud described the deal similarly:

> . . . I settled on the final buyer being myself, my wife, and my brother under the Heartland Land Trust. And Mr. Stone, as his part was to purchase the 20 acres and use the full satisfaction and release of mortgage for his earnest money, meaning that he was going to give full satisfaction for the $50,000 that I owed and that would be then used as his earnest money. And that was our agreement.

> * * *

> [W]hat Tom and I agreed to was if our deal did not go through, through no fault of [Stone's] own, that I would pay him $25,000.

---

[2] Stroud also owed Fifth Third for a second property he owned in New Trenton, Indiana. Fifth Third agreed to drop the amount owed on that property as well, for a combined total purchase price of $550,000.

> That was the value of the promissory note and the release of
> mortgage at that point. That's what we put the value as.

*Id.* at 202, 205-06.

[5] On April 7, 2009, Stone signed a contract to purchase the farmland directed to Dryden Properties, Inc. and executed a release of the 2003 mortgage on both tracts of land. Also on April 7, Stone's attorney forwarded a copy of the contract to the attorney for the bank providing financing to Stroud. The letter indicates a photocopy of the signed release would be provided immediately and the original release and check for $50,000 would be provided at closing. "Once title is vested in [Stroud], [Stone] will receive a Deed for the real estate and a Policy of Title Insurance insuring that [Stone] holds marketable title free and clear of all liens and encumbrances." Exhibit Vol. I at 73. Due to a "convoluted situation" on Stroud's end, Tr., Vol. 1 at 40, Stone had to execute a replacement contract to purchase the farmland on May 14, directed to Merritt Alcorn, trustee of the Heartland Land Trust.[3] Stone's "earnest money" for the purchase was the release of the 2003 mortgage on both properties, valued at $25,000. The contract to purchase stated, "This Release will only be recorded after the successful closing between Heartland Homestead, LLC and Merritt Alcorn, Trustee occurs. In the event that this contract does not close through

---

[3] It appears that Stroud first intended Dryden Properties, Inc. (comprised of Stroud and a business partner in California) to purchase the land from Heartland Homestead, LLC but that deal did not go through. Stroud then set up Heartland Land Trust (the "Trust") to accomplish the same goal. Stroud is the trustee of the Trust and one of three equal beneficiaries along with his brother Anthony and his wife Victoria.

no fault of [Stone], [t]he Earnest Money . . . shall be valued at $25,000 and returned to [Stone] within ten days of the release of this contract[.]" Exhibit Vol. I at 76-77. The contract was due to close "on June 30, 2009 (or at such time as mutually agreeable in writing) to the parties hereto[.]" *Id.* at 78. The date on the release was changed to May 14 to reflect the new contract date.

[6] The mobile home park was serviced by the Saint Leon Sewer District and a sewer lien in the amount of $17,564.67 was recorded against the property on April 4, 2007. The Trust closed its deal with Fifth Third on May 20 at which time the existing sewer liens were paid in full and the Trust became the owner of both properties. For some reason, however, the sewer liens were not released. Stone's release of the 2003 mortgage was delivered at the May 20 closing and was recorded in Dearborn County on June 12, 2009. The Stone/Trust deal did not close on June 30 due to title searches continuing to show the sewer lien and the corresponding inability of the Trust to deliver free and clear title to Stone. Communications between Stone's attorney and Alcorn as trustee of the Trust continued for some time after June 30, but the sewer lien was never released. In fact, a title search done on January 22, 2018 continued to show the delinquent sewer fees from 2007.

[7] On March 6, 2013, an attorney contacted Stroud on Stone's behalf in a renewed attempt to complete the purchase of the farmland, stating "Mr. Stone is ready, willing and able to pay the purchase price for the subject real estate upon being provided a Warranty Deed for the real estate, free and clear of all liens and encumbrances." Exhibit Vol. I at 83. However, the deal was still unable to

close due to the continued presence of the sewer liens. Stone has never received proof of unencumbered title to the farmland, a deed to the farmland, or the $25,000 in escrow money.

[8]     Stone filed a lawsuit on February 23, 2016, asking for specific performance as to the 2009 contract for sale of the farmland and repayment of the 2003 Promissory Note. Stroud filed an answer and asserted several affirmative defenses, including the statute of limitations. Following a bench trial on March 8-9, 2018, the trial court entered judgment for Stone:

Promissory Note Judgment

Based upon these findings, Judgment shall be entered in favor of [Stone] in the amount of sums due and owing under the Promissory Note as of February 22, 2018 as to Defendants, James R. Stroud, and Steven G. Verkley individually and Heartland Homestead, LLC, and successors [in] interest as follows:
1. $113,246.77 in principle [sic], late fees and interest,
2. $15,000 for attorney's fees for enforcing rights under fixed rate promissory note,
3. $1,226 costs, medication [sic] fees, costs of depositions and appraisals, and

Specific Performance and Earnest Money

The Court finds that specific performance is an inappropriate remedy in this cause of action based upon the fact that [the contract to purchase] shows that the parties contemplated a remedy for the closing not occurring "through no fault of the buyer." The earnest money in this circumstance was valued at $25,000. The Court, therefore, finds the judgment for this

amount is appropriate instead of a specific performance
remedy. . . .

Appendix of Appellants, Volume Two at 18. Stroud now appeals.

# Discussion and Decision[4]

## I. Standard of Review

"On appeal of claims tried by the court without a jury . . . the court on appeal
shall not set aside the findings or judgment unless clearly erroneous, and due
regard shall be given to the opportunity of the trial court to judge the credibility
of the witnesses." Ind. Trial Rule 52(A). We define the clearly erroneous
standard based upon whether the party is appealing a negative judgment or an
adverse judgment. *Fowler v. Perry*, 830 N.E.2d 97, 102 (Ind. Ct. App. 2005).
Because the trial court entered an order against Stroud, who was defending on
the issues under review, he is appealing from an adverse judgment. *See Garling
v. Ind. Dep't of Nat. Res.*, 766 N.E.2d 409, 411 (Ind. Ct. App. 2002), *trans. denied*.
When the trial court enters findings in favor of the party bearing the burden of
proof, the findings will be clearly erroneous only if they are not supported by
substantial evidence of probative value. *Id.* "We will affirm a judgment where
we find substantial supporting evidence, unless we are left with a definite and

---

[4] The section headings in Stroud's brief as well as certain phrases in the text are in colored type and there are
purported internal hyperlinks (and at least one external hyperlink) also in colored type. We remind counsel
that Indiana Appellate Rule 43(C) requires a brief to be "produced in a neat and legible manner using black
type." Moreover, at least in the version of the brief used by this court, the hyperlinks do not work.

firm conviction that a mistake has been made." *McCauley v. Harris*, 928 N.E.2d 309, 313 (Ind. Ct. App. 2010), *trans. denied*.

## II. Promissory Note Judgment

[10] Stroud first contends the trial court erred in granting judgment on the Promissory Note because the statute of limitations for Stone to recover on the note passed before he filed his complaint. Stroud raised the statute of limitations as an affirmative defense in the trial court, alleging the cause of action on the note accrued in June 2008 when the note fell into default. Stone countered that the statute of limitations runs from the note's maturity date of July 1, 2013. The trial court agreed with Stone. *See* App. of Appellants, Vol. Two at 15 ("Due to the fact that [Stone] took no action to accelerate the due date of the promissory note, the maturity date of July 1, 2013 remains the maturity date under the note and [Stone's] Complaint was filed within the applicable statute of limitations for enforcement of [Stone's] right under that promissory note.").

[11] Indiana Code section 34-11-2-9 requires an action on a promissory note executed after August 31, 1982 to be commenced within six years after the cause of action accrues.[5] If Stroud is correct, and the cause of action accrued

---

[5] Stone argues the Promissory Note incorporated the terms of the mortgage, and the mortgage provided that it was to be governed by the laws of Ohio. *See* Exhibits Vol. I at 43. However, Stone never raised the issue of applying Ohio law during the trial court proceedings, and issues raised for the first time on appeal are waived. *See Pearman v. Stewart Title Guar. Co.*, 108 N.E.3d 342, 350 (Ind. Ct. App. 2018), *trans. denied*. In any event, contractual choice of law provisions govern only the substantive law of claims arising out of the contract; the law of the forum state governs procedure such as the appropriate statute of limitations. *Smither*

when Heartland Homestead LLC missed its first payment in June 2008, the statute of limitations would have run in June 2014. Stone did not file his complaint on the promissory note until February 2016. If Stone is correct, however, the cause of action accrued on July 1, 2013, and his complaint was timely.

[12] In *Smither v. Asset Acceptance, LLC*, 919 N.E.2d 1153 (Ind. Ct. App. 2010), the court considered whether a creditor's action against a debtor was time-barred. The debtor obtained a credit card from the creditor and by February 2000, had a balance of over $1,700 on the card. He made a partial payment on February 9, 2000, and never made another payment. The credit card agreement stated that the debtor would be in default if he failed to pay any amount due and that in the event of default, the creditor "may, without further demand or notice," declare the balance immediately due. *Id.* at 1155. Nonetheless, the creditor continued sending monthly billing statements for several months. In December 2000, the creditor sent its final bill showing an outstanding balance of $2,152.67, and requesting a minimum payment of $670.00 that was never paid. In December 2001, Asset Acceptance, LLC purchased the debtor's account from the original creditor. On May 30, 2006, Asset filed suit against the debtor, seeking the amount shown on the final bill plus interest. Eventually, the trial court entered summary judgment in favor of Asset and the debtor appealed.

---

*v. Asset Acceptance, LLC*, 919 N.E.2d 1153, 1157-58 (Ind. Ct. App. 2010). Further, Ohio's statute of limitations applicable to a promissory note is also six years. Ohio Rev. Code § 1303.16(A).

[13]    In deciding the statute of limitations issue, the court considered whether the six-year statute of limitations in Indiana Code section 34-11-2-9 applicable to promissory notes, bills of exchange, or other written contracts for the payment of money or the six-year statute of limitations in Indiana Code section 34-11-2-7 applicable to actions on accounts and contracts not in writing applied to this case. Although both impose six-year limitations periods, the label applied to the debt "affects the commencement of the running of the statute of limitations." *Id.* at 1158.

[14]    The court first described the difference between a closed-end contract and an open-end contract: in closed-end contracts, the principal amount of the debt is fixed and there is a defined schedule of repayment specifying the amount of each payment and when the payment is due until the debt is fully repaid on a date certain. *Id.* at 1159. In open-end contracts, the amount of debt is unknown at the outset and can fluctuate over time; therefore, the monthly payment, the amount of interest, and the date for payment in full will also fluctuate. *Id.* The court then noted that in general, the statute of limitations for a closed-end account such as an installment loan or promissory note with an optional acceleration clause does not begin to run immediately upon the debtor's default but only when the creditor exercises the optional acceleration clause by an affirmative act; in an open-end account,[6] the statute of limitations

---

[6] Presumably, the same would be true of a closed-end account with a mandatory acceleration clause. *See Cowan v. Murphy*, 165 Ind. App. 566, 572, 333 N.E.2d 802, 805-06 (1975) (holding that an acceleration clause providing that if any payment is more than forty-five days in default, the note in its entirety "shall become

commences on the date the account is due.  *Id.* at 1160.  Regardless, "a party is not at liberty to stave off operation of the statute [of limitations] inordinately by failing to make demand."  *Id.* at 1161 (quoting *Curry v. U.S. Small Bus. Admin.*, 679 F. Supp. 966, 969-70 (N.D.Cal. 1987)).

[15]   Turning back to the facts of the case before it, the *Smither* court noted that the credit card account at issue "would appear to closely resemble the common law definition of an 'open account.'"  *Id.* at 1159.  Accordingly, where the debtor made his last payment on February 9, 2000, and then failed to make the next minimum payment due by March 11, 2000, the statute of limitations began to run, at the latest, on March 11, 2000.  The creditor had six years from that date in which to file suit seeking collection of any part of the debt.  The creditor's lawsuit filed on May 30, 2006 was therefore time-barred.  *Id.* at 1162.

[16]   Although *Smither* was decided in the context of an open-end credit card account, this court applied the reasoning of *Smither* to a closed-end account in *Collins Asset Group, LLC v. Alialy*, 115 N.E.3d 1275 (Ind. Ct. App. 2018).  The debtor entered into a promissory note with GMAC Mortgage LLC, promising to pay GMAC $60,000 plus interest in monthly payments of $631.93 beginning on September 1, 2007 and continuing through August 1, 2032.  The debtor also entered into a mortgage as security for the loan which was a junior lien on the debtor's property.  On July 28, 2008, the debtor's property was foreclosed on by

---

immediately due and payable" operates automatically and without regard to the action or inaction of the creditor).

a priority lienholder and the debtor made no further payments on the GMAC note after that date. The GMAC note was transferred to Collins Asset Group ("CAG") on December 31, 2014, and the debtor was informed on June 17, 2016, that he should make payments to CAG beginning on September 1, 2016. The debtor did not make a payment and CAG sent notice that it was accelerating the note. When the debtor did not make payment in full, CAG filed a complaint on April 26, 2017. The debtor claimed the complaint was untimely and trial court dismissed the complaint.

[17] The court noted the general rule that when an installment contract contains an optional acceleration clause, the statute of limitations does not begin to run immediately upon the debtor's default but only when the creditor exercises the option to accelerate the debt.

> Nevertheless, the *Smither* court cautioned that, "Waiting until after the statute of limitations has passed following default before making demand for full and immediate payment of a debt is per se an unreasonable amount of time to invoke an optional acceleration clause and cannot be given effect."

*Id.* at 1279 (quoting *Smither*, 919 N.E.2d at 1161-62). CAG waited to exercise the option to accelerate the note until October 24, 2016 – more than six years after the default. The court concluded, "[a]s CAG's attempt to exercise the acceleration clause did not prevent the six-year statute of limitation from taking effect and expiring," the trial court properly dismissed the complaint. *Id.*

[18]    Here, the Promissory Note was originally signed on April 29, 2003. Stroud made his last payment in May 2008. Stone filed his complaint seeking repayment of the 2003 Promissory Note on February 23, 2016. The default therefore occurred in May 2008, but Stone did not demand payment for nearly eight years after the default. Pursuant to *Smither* and *Alialy*, Stone's complaint is time-barred because he waited until after the six-year statute of limitations had run before making a demand for payment of the debt. That is a *per se* unreasonable amount of time to wait before invoking an optional acceleration clause. *See Smither*, 919 N.E.2d at 1161-62.[7] Therefore, the trial court erred in entering judgment for Stone on the promissory note and ordering Stroud to pay over $100,000 as satisfaction of the indebtedness.[8]

## III.  2009 Contract Judgment

[19]    As for the amount due under the 2009 contract, Stroud's argument centered on the trial court issuing a "duplicate remedy" with the promissory note judgment *and* the judgment under the 2009 contract. Brief of Appellants at 7. Because we have determined the promissory note judgment was entered in error, we need not address Stroud's argument regarding the alleged double recovery.

---

[7] Even if we consider the date of the renegotiated promissory note in April and May of 2009 to be relevant, Stone *still* waited more than six years past that date to file his complaint.

[8] Stroud makes a secondary argument about the 2003 Promissory Note, but we need not reach that issue because of our resolution of the statute of limitations question.

Moreover, "Heartland Land Trust acknowledges it owes Stone the return of the $25,000 earnest money[.]" *Id.* at 8.

[20] The trial court's judgment, including both the judgment on the 2003 Promissory Note and the 2009 contract, states:

> The Court finds that Judgment in favor of [Stone], for the amounts stated herein, are entered against James R. Stroud; Steven G. Verkley; Heartland Homestead, LLC, Heartland Land Trust; and any successors in interest.

App. of Appellants, Vol. Two at 19. Stroud argues this judgment against Stroud, Verkley, and Heartland Homestead LLC is in error because the 2009 contract was entered into with the Trust alone. Because we have found judgment was entered on the promissory note in error, we agree that the remaining judgment should be against only the Trust, and we remand for the trial court to issue a corrected judgment.

# Conclusion

[21] Stone did not file his complaint until more than six years had passed from the date of default on the Promissory Note and therefore, the complaint for repayment of sums owing under the note should have been dismissed as time-barred. The judgment as to the Promissory Note is therefore reversed. As the only valid judgment in Stone's favor was on the 2009 contract for the return of the earnest money and that contract was entered into between Stone and the

Trust, we remand for the trial court to amend its judgment to reflect it is entered against the Trust alone.

[22] Reversed in part and remanded.

Riley, J., and Kirsch, J., concur.